UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH L. SCHMELTER

             Plaintiff,               CIVIL ACTION NO. 06-CV-12031-DT

      vs.                       DISTRICT JUDGE JOHN FEIKENS

COMMISSIONER OF               MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

            Defendant.
_____/

REPORT AND RECOMMENDATION

I.     RECOMMENDATION

      This Court recommends that Defendant's Motion for Summary Judgment be **DENIED** (Docket # 15), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 8), and that the case be **REMANDED** for further proceedings consistent with this Report.

II.    PROCEDURAL HISTORY

      This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

      Plaintiff Deborah Schmelter filed an application for Disability Insurance Benefits (DIB) on February 27, 2002. (Tr. 49-52). She alleged she had been disabled since November 30, 2001 due to chronic myofascial pain, fibromylagia, chronic fatigue syndrome, and depression. (Tr. 66). Plaintiff's claims were initially denied. (Tr. 28-32). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 33). A hearing took place before ALJ Regina Sobrino on April 1, 2004. (Tr. 699-742). Plaintiff was represented by an attorney at the hearing. (Tr. 25, 701). The ALJ denied Plaintiff's claims in an opinion issued on August 24, 2004. (Tr. 15-24). The Appeals Council denied review of the ALJ's

decision on March 8, 2006 and the ALJ's decision is now the final decision of the Commissioner.  (Tr. 5-14).  Plaintiff appealed the denial of her claim to this Court and both parties have filed motions for summary judgment.

## III.   <u>MEDICAL HISTORY</u>

In February and March 2001 Plaintiff saw her primary care physician, Dr. April Tyler, complaining of migraines, vomiting, diarrhea, and heartburn.  (Tr. 257, 263).  Dr. Tyler referred Plaintiff to Dr. Dilip M. Desai.  (Tr. 257-58).  Dr. Desai reported that tests had shown Plaintiff had reflux esophagitis and a small hiatal hernia and that there was also evidence of mild esophageal candidasis.  (Tr. 189-90, 258).

In May and June 2001 Plaintiff reported to Dr. Tyler that she had lower back and right hip pain but that her headaches had decreased.  (Tr. 251, 256).  Plaintiff stated that she had trouble lifting up her leg when walking and that she felt a sharp, shooting pain running down her right knee.  (Tr. 251).  Dr. Tyler ordered an MRI of Plaintiff's lumbar spine.  *Id.*  A subsequent MRI showed no evidence of spinal stenosis or high-grade lumbar spinal foraminal narrowing.  There was evidence of mild multi-level desiccation and Schmorl's nodes and mild facet arthropathy at L4-L5 and L5-S1.  (Tr. 250).

In July 2001 Plaintiff told Dr. Tyler that she now had pain in both hips and in her groin area especially when walking and climbing stairs.  She also had trouble sleeping and was tearful, irritable, and "stressed out." (Tr. 249).  Dr. Tyler subsequently ordered x-rays of Plaintiff's hips.  *Id.*  X-rays reflected that Plaintiff's hips were intact with no evidence of fractures or dislocations and the joint spaces were normal.  However, there was a partial sacralization of the L5.  (Tr. 246).

Plaintiff was treated by Dr. Glenn Krieger in August 2001 for complaints of neck, hip, and upper back pain.  (Tr. 299).  Dr. Krieger noted that Plaintiff had numerous tender trigger points and therefore diagnosed Plaintiff with fibromylagia.  (Tr. 299-300).  Dr. Krieger administered trigger point

injections.  (Tr. 300, 318).  Dr. Krieger wrote an "off work" note for 8/8/01 to 8/26/01 on a piece of prescription pad paper citing to Plaintiff's back pain, muscle spasms, and sciatica.  (Tr. 294).  Dr. Krieger also prescribed medication, physical therapy three times a week for 4 to 6 weeks, and further injections. He also ordered blood work.  (Tr. 205, 296-97).

Plaintiff began physical therapy in September 2001.[1]  (Tr. 204).  Plaintiff informed the therapist that she had severe pain in her tail bone, groin, thighs, and neck, and that she could hardly walk.  *Id.* The therapist noted that Plaintiff had a decreased range of lumbar motion, decreased strength in her bilateral lower extremities, increased pain to palpation in her bilateral gluts, thighs, and upper traps, decreased range of cervical motion, and a positive straight leg raising test.  *Id.*  To address these issues, the therapist devised a treatment plan consisting of an ultrasound of Plaintiff's lower back, heat, massage, and therapeutic exercises.  *Id.*  Plaintiff returned to Dr. Tyler in September 2001 with complaints of migraine headaches for which she was given Toradol injections.  (Tr. 242-43, 245).

Plaintiff also saw Dr. Krieger in October 2001 and informed him that the injections were initially helpful but did not have a lasting effect.  (Tr. 286).  Dr. Krieger prescribed continuing physical therapy and he discussed a different type of injection with Plaintiff.  *Id.*  Dr. Krieger also wrote another "off-work" note for Plaintiff for the day.  (Tr. 197, 285).

In October 2001 Plaintiff also resumed physical therapy and began a Dynatron Sympathetic Treatment Program prescribed by Dr. Krieger.  (Tr. 198-203).  Plaintiff's therapist reported on October 10, 2001 that Plaintiff was progressing well.  She had an increased range of lumbar and cervical motion, increased bilateral lower extremity strength, and a negative straight leg raising test.  (Tr. 199).  Plaintiff was discharged from physical therapy in November 2001 and it was noted that she was independent

_____

[1]     The record also reflects that Plaintiff had previously undergone physical therapy. (Tr. 207-16).

-3-

with her home exercise program. (Tr. 526). Plaintiff told Dr. Krieger in November 2001 that her back felt better but she still had pain running down her hips and thighs. (Tr. 284). Dr. Tyler noted the same month that Plaintiff was depressed. (Tr. 241). By December 2001, however, Plaintiff stated to Dr. Krieger that her pain had increased and a TENS unit was prescribed. (Tr. 192, 283). Dr. Krieger noted that Plaintiff was to be "off work" for 2 weeks. (Tr. 283). The next month Plaintiff received her first "prolo-therapy" injection from Dr. Krieger. (Tr. 282).

Between February and May 2002 Plaintiff continued her treatment with Dr. Krieger and received prolo-therapy injections. (Tr. 273-281). During this time period, Plaintiff's pain level fluctuated. She was also becoming depressed and frustrated. *Id.*

Plaintiff was also seen by Dr. Tyler between January and April 2002. On January 2, 2002 Plaintiff reported to Dr. Tyler that she was having difficulty transporting patients at work and that she experienced an increase in pain when walking and climbing stairs. (Tr. 236). Dr. Tyler wrote Plaintiff a return to work note with restrictions against mandatory over-time and patient transports. (Tr. 235, 732). On January 11, 2002 Plaintiff and Dr. Tyler discussed placing Plaintiff on short-term disability for fibromylagia and starting a rehabilitation program. (Tr. 234). Plaintiff returned to Dr. Tyler on January 15, 2002 complaining of edema in her feet, legs, hands, arms, and face. (Tr. 233). Dr. Tyler wrote a note releasing Plaintiff from work for 8 weeks. (Tr. 232).

In February and March 2002 Dr. Tyler completed an insurance disability form indicating that Plaintiff was disabled from January 15, 2002 through July 15, 2002 because she could not lift patients or ambulate. (Tr. 222-25, 227-28). Dr. Tyler reported that Plaintiff could not crouch or crawl but she could climb, stoop, kneel, walk, sit, and stand for up to 2.5 hours and could balance and reach for up to 5.5 hours per an 8-hour workday. (Tr. 225). Dr. Tyler also noted that Plaintiff could

lift/carry/push/pull up to 10 pounds and walk occasionally.  *Id.*  Dr. Tyler opined that Plaintiff was capable of performing part-time sedentary work.  *Id.*

In April 2002 Dr. Tyler completed a disability report at Defendant's request. (Tr. 217-220). Dr. Tyler stated that Plaintiff had fibromylagia and widespread musculoskeletal pain, sleep disturbance, morning stiffness, anxiety/depression, and migraine headaches. (Tr. 217-18).  She further indicated that Plaintiff had a 22 trigger points which were mostly in her upper and lower back but were also present in her arms, knees, and right clavicle. (Tr. 218).  Dr. Tyler noted that Plaintiff had clinical depression resulting from her pain which caused a decreased thought process, forgetfulness, poor concentration, and an inability to perform her nursing duties.  *Id.*  She often presented at examinations with a tearful, flat, or sad affect.  *Id.*  Plaintiff also could not do laundry, raking, housework, or grocery shopping without frequent resting.  Dr. Tyler further stated that Plaintiff shuffled when she walked, had a narrow stance, and limped. (Tr. 219).  Nevertheless, Dr. Tyler indicated that she was uncertain as to whether Plaintiff had any anticipated permanent functional loss.  *Id.*

Dr. Gordon Forrer, a board certified psychiatrist, performed a consultative examination of Plaintiff in May 2002 at Defendant's request. (Tr. 264-68).  Plaintiff reported that she was not depressed at the current time although she had fleeting thoughts of suicide in the past. (Tr. 266).  Plaintiff reported no hallucinations or delusions. (Tr. 267).  Dr. Forrer observed that during the examination Plaintiff was tearful when discussing her disappointment in having to stop work one year short of retirement and harbored an idea that her employer could have extended her employment in some way. Plaintiff related formally but adequately.  Her overall mood was tearful but Dr. Forrer noted it was "at odds" with the alleged severity of her symptoms.  Dr. Forrer noted that there was a quality of "unbelieveableness" in regard to Plaintiff's symptomology. Dr. Forrer also noted that Plaintiff showed no anxiety, which was not what he had anticipated.  Nevertheless, Plaintiff was cooperative during the

examination and showed no evasiveness, suspiciousness, guardedness, or manipulativeness.  *Id.*  Plaintiff's affect was of a limited range and motility but was otherwise appropriate.  Plaintiff performed well on most of the memory and judgment testing.  (Tr. 267-68).

Dr. Forrer concluded that Plaintiff had a pain disorder associated with psychological factors and a personality disorder, not otherwise specified, with histrionic and avoidant features.  (Tr. 268).  Dr. Forrer did not assign a GAF score but noted that Plaintiff's current level of psychological functioning was adequate.  He also opined that Plaintiff had the psychological capacity to perform full-time unskilled work involving simple and repetitive tasks and retained the capability of performing even more skilled work but that Plaintiff's interest was not directed towards such work.  *Id.*

In July 2002 Dr. Sydney Joseph reviewed Plaintiff's medical records and completed a Psychiatric Review Technique form at Defendant's request.  (Tr. 116-128).  Dr. Joseph concluded that Plaintiff had a somatoform disorder and a personality disorder, which resulted in mild restrictions of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and no episodes of decompensation.  (Tr. 122-23, 126).  Dr. Joseph also completed a Mental Residual Functional Capacity ("RFC") Assessment form.  (Tr. 112-15).  He concluded that Plaintiff was moderately limited in her ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods of time; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) respond appropriately to changes in the work setting; and (5) set realistic goals or make plans independently of others.  *Id.*

In August 2002 Dr. Sadia Shaikh reviewed Plaintiff's medical records and completed a Physical RFC Assessment form at Defendant's request.  (Tr. 130-37).  Dr. Shaikh concluded that Plaintiff had the RFC to: (1) lift/carry 10 pounds occasionally and less than 10 pounds frequently; (2) stand/walk for

-6-

2 hours in an 8-hour workday; (3) sit for about 6 hours in an 8-hour workday with normal breaks; and (4) occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Tr. 131-32).

Dr. Krieger filled out a healthcare form for Plaintiff's employer in August 2002.  (Tr. 269-70). Dr. Krieger reported that Plaintiff was "incapacitated" from working between August 8, 2001 and at least August 8, 2002.  He indicated that Plaintiff could perform some intermittent work but was unable to perform "heavy work, repetitive motion activities."  (Tr. 270).

Plaintiff returned to Dr. Tyler in April 2003 stating that she still had severe lower back pain.  (Tr. 494).  A May 2003 ultrasound of Plaintiff's lower back revealed no cystic or solid lesions.  (Tr. 558). Plaintiff reported in June 2003 that she was feeling depressed again and was in a lot of pain, which was being aggravated by work.  (Tr. 492).  She was sleeping okay but would cry for no reason.  *Id.*  In July 2003 Dr. Tyler reported that Plaintiff had been admitted into a chronic pain therapy management program.  (Tr. 491).  Plaintiff had stated that she could no longer work the hours required for her nursing job and that she had difficulty bending, sitting, squatting, and standing.  Dr. Tyler noted that Plaintiff's pain was so severe that at the beginning of therapy, Plaintiff refused to have massage therapy because she could not stand to be touched.  *Id.*  Dr. Tyler further stated that Plaintiff had tried chiropractic and physical therapy, dextrose trigger point injections, and analgesic therapy, without success. Dr. Tyler planned to start Plaintiff on paravertebral injections without massage and hoped to later add massage into the regime.  *Id.*

Plaintiff reported in July 2003 that receiving the injections "was amazing" because she had "hardly been sore" and was "able to do more."  Plaintiff stated that her lower back pain had decreased by 50%.  However, Plaintiff was still resistant to massage therapy.  (Tr. 489).  Plaintiff received a second injection in July and reported that she was having a flare-up accompanied by a severe headache.

However, her lower back pain was more of an aching rather than searing pain. Plaintiff's muscle spasms had also decreased by 40%. (Tr. 486).

On August 18, 2003 Dr. Tyler reported that Plaintiff had shown remarkable improvement. She noted that Plaintiff had called it a "miracle" and that Plaintiff had 50% less pain, was more functional, and was less depressed. Plaintiff also stated that she was no longer going to file for disability. Dr. Tyler noted that treatment was to continue and that Plaintiff had agreed to incorporate massage therapy into the program. (Tr. 485).

Dr. Tyler stated on September 10, 2003 that Plaintiff was having "amazing success." Plaintiff reported that she had gone to a car show and was able to walk for 3 hours on asphalt (although she was sore afterwards). Dr. Tyler also noted that Plaintiff had weaned herself off of analgesics and was dependent only upon chiropractic therapy, massage, and injections but she still refused injections on her thighs and knees. Plaintiff also had not had a flare-up for two months and had been maintaining a 60% reduction in pain. Dr. Tyler stated that she was pleased with Plaintiff's progress and that while Plaintiff's condition and treatment were chronic in nature, she believed that with continued treatment Plaintiff could work full-time, enjoy her family, and perform normal activities. (Tr. 484). The same month Plaintiff reported to Dr. Tyler that she could not believe how much better she was feeling and that she was no longer suicidal and could work full-time. (Tr. 483).

In October 2003 Dr. Tyler reported that Plaintiff was continuing with her treatment but that they had reached a plateau in terms of pain improvement. (Tr. 481). Plaintiff stated that she had run for the elevator and that this was the first time in 10 years she had been able to run. *Id.* Plaintiff's mental health had also improved. *Id.* An EMG taken in October 2003 of Plaintiff's lower extremities was essentially normal. Although the test suggested a possible sensory mononeuropathy, this would not be the cause of Plaintiff's complaints of pain and weakness in her extremities. (Tr. 553-57).

-8-

Plaintiff returned to Dr. Tyler in November 2003 and was tearful and upset. She reported that she was in a lot of pain in her lower back, which radiated into her legs, and that the only time she was not in pain was when she was asleep. Plaintiff also reported that she had gone for three weeks without treatment. (Tr. 478). Dr. Tyler advised Plaintiff that she required long-term therapy due to the chronic nature of her condition. *Id.*

Plaintiff resumed treatment with Dr. Tyler in 2004. (Tr. 320-21, 473-76). Dr. Tyler completed a Physical RFC form prepared by Plaintiff's counsel on March 29, 2004. Dr. Tyler concluded that because of her fibromylagia and chronic fatigue syndrome, Plaintiff: (1) could sit/stand/walk for 4 hours in an 8-hour workday with a sit/stand at-will option and a lie down/recline at-will option; (2) could lift/carry up to five pounds occasionally but never frequently; (3) could use both upper extremities for occasional grasping and fine manipulation; (4) was extremely limited in using both upper extremities for reaching; (5) could never use her right upper extremity for pushing/pulling; (6) was extremely limited in using her left upper extremity for pushing/pulling; (7) should avoid all repetitive and forceful use of her upper extremities including use of air guns and power tools; (8) could never crawl; and (9) was extremely limited in her ability to bend, squat, kneel, and reach above shoulder level. (Tr. 303-04).

Dr. Tyler also completed a Mental RFC form prepared by Plaintiff's counsel. Dr. Tyler concluded that because of her clinical depression, Plaintiff was moderately limited (defined as seriously limited in ability to function but not precluded)[2] in her ability to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out detailed instructions; (3) make simple work-related decisions; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) travel in unfamiliar places or use public transportation. Dr. Tyler further concluded that Plaintiff was

_____

[2]       According to the form, "moderately limited" has the same meaning as "not significantly limited." (Tr. 305).

-9-

markedly limited (defined as having no useful ability to function) in her ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent basis without an unreasonable number and length of rest periods; (5) respond appropriately to changes in the work setting; and (6) perform one to two step, low-stress, unskilled jobs on a regular basis. (Tr. 305-07).

In May 2004 Dr. Matthew Dickson, a psychologist, performed a consultative examination at Defendant's request. (Tr. 580-86). Plaintiff had driven herself to the appointment and was punctual. Dr. Dickson also observed that Plaintiff had a normal gait, posture, and motor activity. Plaintiff's speech was unimpaired and she was cooperative throughout the examination. (Tr. 580). Dr. Dickson also performed a battery of tests. Based upon the test results, Dr. Dickson concluded that Plaintiff had a low average working memory but an average auditory immediate memory, auditory delayed memory, and immediate memory. Plaintiff also displayed a higher than average visual immediate memory, visual delayed memory, auditory recognition delayed memory, and general memory. *Id.* Dr. Dickson also reported that Plaintiff had average reading and arithmetic scores and no impairment of her visual motor coordination. (Tr. 582). He noted that projective tests suggested that Plaintiff had regressive and immature tendencies as well as a possible character disturbance and expansive tendencies under stress. *Id.*

Plaintiff reported to Dr. Dickson that she generally got along with other people and stated that "[e]verybody just loves me." She also stated that she spent time with friends and that her prior relationship with co-workers was satisfactory. (Tr. 583). Plaintiff also told Dr. Dickson that she generally spent her days cleaning the house, cooking, grocery shopping, and doing laundry but it took longer because of the pain and need for frequent breaks. (Tr. 583-84). Her husband handled most of

-10-

the bill paying although she handled some bills.  Plaintiff was also able to drive a car, attend to her

personal grooming, and did not require assistance with scheduling, keeping appointments, or finding

locations.  (Tr. 584).  During the examination, Dr. Dickson observed that Plaintiff was in contact with

reality throughout the examination although he did not know if she was exaggerating her medical

symptoms.  *Id.*  Plaintiff's speech was unimpaired and her mental activity was spontaneous and

organized.  Her affect was appropriate and her mood was normal during the examination although

Plaintiff reported being generally depressed.  *Id.*  Plaintiff was able to recall 3 objects after 3 minutes,

name past and present presidents, identify famous people, current events and major cities, perform

simple calculations, engage in abstract thinking, articulate the similarities and differences between

objects, and exercise judgment.  (Tr. 585).  Although Plaintiff was only able to recall 5 numbers forward

and 4 numbers backwards, Dr. Dickson was not certain that Plaintiff gave her best effort on this task.

*Id.*  Dr. Dickson concluded that Plaintiff had an adjustment disorder with depressed mood and assigned

her a GAF score of 60.  He further opined that Plaintiff's ability to understand, remember, and carry

out instructions and her ability to respond appropriately to supervision, co-workers, and work pressure

were not affected by her mental impairment.  (Tr. 587-88).

## IV.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff was 47 years old when she testified before the ALJ.  She had an associates degree in

nursing.  (Tr. 703-04).  Plaintiff testified that she took various medications for her medical

conditions with no side effects.  The Duragesic patch helped a great deal with the pain and the

Zoloft was about 75% effective in helping with her depression.  (Tr. 711-12).  Plaintiff also took

Darvocet about 2 or 4 times day for breakthrough pain.  (Tr. 721).  She had also taken Oxycotin for

about 8 months, which made Plaintiff feel "really good."  (Tr. 722).  However, she was taken off this

-11-

medication when her mother died because she became very depressed and suicidal.  (Tr. 722).

Plaintiff stated that she had never been hospitalized for her conditions.  (Tr. 712).  She had been to

the emergency room on one occasion because she thought she was having a heart attack.  (Tr. 712-

13)  However, it was determined that Plaintiff had anxiety and stress.  She was treated and released.

(Tr. 713).   Plaintiff also undertook physical therapy on several occasions and she received various

injections.  Plaintiff stated that the injections were initially helpful but did not have a lasting effect so

she stopped receiving them.  Plaintiff had also tried a TENS unit but it was not helpful.  (Tr 718).

In December 2003 Plaintiff began treatment with a chiropractor who said he could cure

fibromylagia.  (Tr. 717).  Plaintiff also informed the ALJ that lying on her back with her legs on a

pillow helped but she still had pain.  (Tr. 720, 728).  At night, she usually lied on her stomach so she

did not feel pain.  *Id.*

Plaintiff estimated that she could stand for about 15-30 minutes, walk for about 15 minutes,

and sit for about 30 minutes although sitting was uncomfortable.  Plaintiff also told the ALJ that she

used a cane for about 5 months in 2001 but it had not been prescribed.  (Tr. 708-09).  Plaintiff

indicated that it hurt to lift anything but that she could lift a gallon of milk or water and carry it from

her refrigerator to her kitchen table.  *Id.*  According to Plaintiff, her hands were weak so she had

trouble writing and manipulating buttons.  She had filled out the disability forms but had difficulty

doing so as evidenced by her sloppy writing.  (Tr. 710).  Plaintiff thought that she could write a

couple of paragraphs before she had to take break.  *Id.*  Plaintiff stated that she had no trouble

reaching with her arms.  (Tr. 710-11).  However, it hurt to bend at waist so Plaintiff tried to bend at

knees even though this movement hurt her thighs.  (Tr. 711).  Plaintiff also testified that her legs felt

as if they would fall off after climbing 12 to 13 steps.  *Id.*

-12-

Plaintiff informed the ALJ that she shopped for groceries and occasionally visited with friends and family. (Tr. 713). When she shopped, she had to write a list otherwise she would forget things. (Tr. 723). Plaintiff read newspapers, magazines, and books and she worked in her vegetable garden. (Tr. 714). Plaintiff told the ALJ that she did not have any trouble dressing herself but she was sensitive to heat and cold. *Id.* Plaintiff also stated that she was able to drive to the grocery store, friends' homes, and sometimes to her children's school activities. (Tr. 715, 716). She had gone on a couple of long trips to visit family over the years but her husband drove. (Tr. 715).

Plaintiff further testified that she had good days and bad days with more days being bad. On bad days, she did not shower but she did get dressed, brush her teeth, and comb her hair. She also had to lay down 3 or 4 times a day for several hours. (Tr. 721, 728-29). Plaintiff also told the ALJ that she was often forgetful. She sometimes forget to fill the car up with gas or to pay bills. (Tr. 723, 730). Plaintiff also had difficulty sleeping through the night. Occasionally she awoke at 3:00 a.m. for several days in a row and would then sleep for a couple of days in a row. (Tr. 723).

### C.   Vocational Expert's Testimony

Melody Henry, a vocational rehabilitation counselor, testified as an expert at the hearing. (Tr. 733-41). The ALJ asked Ms. Henry what jobs would be available for an individual of Plaintiff's age, education, and work experience, who had the RFC to do work that involved: (1)occasionally lifting/carrying no more than 5 pounds; (2) no pushing or pulling; (3) standing/walking for 6 hours in an 8-hour workday; (4) sitting for up to 4 hours in an 8-hour workday; (5) an at-will sit/stand option; (6) no climbing ladders, ropes, or scaffolds; (7) occasionally climbing stairs; (8) rarely stooping, kneeling, crouching, or crawling; (9) no forceful gripping, grasping, pinching, twisting, or squeezing; (10) frequently handling, fingering, and feeling; (11) no overhead reaching; (12) no

exposure to vibration or extremes of temperature; (13) no use of foot or leg controls; and (14) simple and routine work.  (Tr. 736).

Ms. Henry testified that such a person could perform work in the lower peninsula of Michigan at the unskilled, sedentary level as a production inspector (2,175 jobs), records clerk (1,035 jobs), and general office clerk (9,475 jobs).  Ms. Henry further testified that these jobs involved low stress which typically meant that there was minimal to no contact with the general public, no supervision of other employees, and no need to exercise independent judgment or to maintain precise tolerances.  (Tr. 737).  Ms. Henry also indicated that these jobs required an individual to perform work duties 8 hours a day, 5 days a week and could not accommodate an individual who was required to lie down during the workday.  (Tr. 738).

In response to questioning from Plaintiff's counsel, Ms. Henry testified that these unskilled jobs would not be precluded if the individual had no useful ability to maintain attention and concentration for extended periods of time.  (Tr. 739-40).  However, if the individual could not perform activities within a schedule, maintain a regular attendance, or be punctual within customary tolerances then competitive employment would be precluded.  (Tr. 740).  Similarly, competitive employment would be precluded for an individual who could not work at a consistent pace without an unreasonable number and length of rest periods and who could not perform one or two step tasks on a consistent basis.  (Tr. 740-41).

## V.   LAW AND ANALYSIS

### A.   STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S.

-14-

389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B.     FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

    (1)    he was not presently engaged in substantial gainful employment; and

    (2)    he suffered from a severe impairment; and

    (3)    the impairment met or was medically equal to a "listed impairment;" or

    (4)    he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving

-15-

that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.  To

meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the

claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human

Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational

expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays

[the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

## C.   ARGUMENTS

The ALJ found at step one of the sequential analysis that Plaintiff had not engaged in substantial

gainful employment since her alleged onset date.  (Tr. 19).  At step two, the ALJ determined that

Plaintiff had the following severe impairments: fibromylagia, chronic fatigue syndrome ("CFS"),

degenerative disc disease, a pain disorder, depression, and a personality disorder.  (Tr. 20, 26).  The ALJ

further found at step three that Plaintiff's documented impairments did not meet or medically equal any

listed impairments.  (Tr. 23).

The ALJ thereafter concluded that Plaintiff had the RFC to perform work involving: (1)

lifting/carrying 5 pounds occasionally; (2) no pushing or pulling; (3) standing/walking for up to 2 hours

in an 8-hour workday; (4) sitting for at least 6 hours in an 8-hour workday; (5) a sit/stand at-will option;

(6) no crawling or climbing ladders, ropes, or scaffolds; (7) occasionally climbing stairs; (8) rarely

stooping, kneeling, or crouching; (9) no forceful gripping, grasping, pinching, twisting, squeezing, or

overhead reaching; (10) frequently handling, fingering, and feeling; (11) no exposure to vibration or

extreme temperatures; (12) no operation of foot or leg controls; and (13) simple, routine work.  (Tr. 23-

24).  The ALJ then concluded at steps four and five of the sequential analysis that, based upon the VE's

testimony, Plaintiff could not return to her past relevant work but she could perform a significant

number of jobs in the regional economy. (Tr. 22-24). The ALJ therefore concluded that Plaintiff was not disabled.

Plaintiff challenges the ALJ's findings on two grounds. She asserts that the ALJ failed to properly apply Social Security Ruling ("SSR") 99-2p in addressing Plaintiff's fibromylagia and chronic fatigue syndrome. Plaintiff also contends that the ALJ erred by failing to properly give controlling weight to the opinions of Dr. Krieger and Dr. Tyler regarding Plaintiff's physical and mental limitations.

### 1.  SSR 99-2p

Plaintiff cites to SSR 99-2p, 1999 WL 271569, at *1 (April 30, 1999), and states that the ALJ failed to follow its dictates when analyzing Plaintiff's fibromylagia and CFS. (Pl.'s Mot. for Summ.J. at 3-4, 15-16). SSR 99-2p explains that fibromylagia and CFS can constitute disabling impairments under the Social Security regulations in certain cases.[3] *Id.* The ALJ determined that Plaintiff had established the existence of fibromylagia and CFS as severe, medically determinable impairments. Therefore, the ALJ did not fail to comport with SSR 99-2p's mandate in this regard.

Nevertheless, Plaintiff points to a comment in SSR 99-2p which notes that statements from a claimant's treating medical source regarding "the nature and severity of an individual's impairments are entitled to deference and may be entitled to controlling weight." *Id.*, at * 7. This comment, however, does not reference a rule that is unique to cases involving CFS or fibromylagia. Rather, it mirrors the rules found in 20 C.F.R. § 404.1527(d) and SSR 96-2p and 96-5p, which are applicable to the evaluation of all medical impairments. Indeed, SSR 99-2p specifically states that when assessing a claimant's limitations, the same sequential process used for evaluating all other types of impairments in social

---

[3]     SSR 99-2p technically addresses only cases involving CFS although fibromylagia is mentioned in the Ruling as an impairment that has symptoms that overlap those of CFS. SSR 99-2p, at ** 1, 4, 8 fn. 3. Nevertheless, Defendant concedes the application of SSR 99-2p to cases involving fibromylagia. (Def.'s Mot. for Summ.J. at 15-16).

security cases is used when addressing CFS and fibromyalgia cases.  SSR 99-2p, at * 4.  Plaintiff's allegation regarding a violation of SSR 99-2p is therefore subsumed within her argument that the ALJ erred by failing to consider and accord controlling weight to the opinions of her treating physicians, Dr. Krieger and Dr. Tyler, which is addressed below.

### 2.   Treating Physician's Doctrine

Plaintiff contends that the ALJ failed to consider and give controlling weight to the opinions of Dr. Krieger and Dr. Tyler regarding Plaintiff's mental and physical limitations.  Consequently, Plaintiff asserts that the ALJ did not fully account for her limitations in her RFC finding and subsequent hypothetical which was posed to the VE.  Thus, the VE's testimony does not provide substantial evidence to support the ALJ's non-disability determination.

As the Sixth Circuit stated in *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997), "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimant's only once."  Indeed, 20 C.F.R. § 404.1527(d)(2) provides that a treating source's opinion regarding the nature and severity of a claimant's condition is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  However, an ALJ is not bound by a treating physician's opinion if that opinion is not supported by sufficient clinical findings or is otherwise inconsistent with other substantial evidence in the record.  *See Walters*, 127 F.3d at 530.  The ALJ need not, however,  "give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ."  20 C.F.R. § 404.1527(e)(3).  One such issue is "the determination or decision about whether you meet the statutory definition of disability."  20 C.F.R. § 404.1527(e)(1).

If an ALJ rejects a treating physician's opinion, she must "give good reasons" for doing so in her written opinion."  20 C.F.R. § 404.1527(d)(2); *see also* SSR 96- 5p and 96-2p.  Furthermore, the Sixth

-18-

Circuit has noted that the ALJ must provide good reasons for the weight given a treating source's opinion. *Wilson*, 378 F.3d 541. The *Wilson* Court reversed and remanded a denial of benefits, even though "substantial evidence otherwise supports the decision of the Commissioner," because the ALJ failed to give good reasons for discounting the opinion of the claimant's treating physician. *Wilson*, 378 F.3d at 543-46. As the *Wilson* court commented, "[a] court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely." *Id.* at 546.

### a.    Dr. Tyler's Opinions

Plaintiff's primary argument is that the ALJ erred by failing to consider and afford controlling weight to Dr. Tyler's opinions regarding her physical and mental limitations as contained within the RFC assessment forms prepared by Dr. Tyler in March 2004.[4] These particular forms were not referred to in the ALJ's written opinion.

Defendant implicitly acknowledges that Dr. Tyler's assessment of Plaintiff's physical and mental limitations were not specifically addressed by the ALJ. Nevertheless, Defendant contends that no error occurred because the ALJ ultimately adopted most of Dr. Tyler's opinions. *See Wilson*, at 547 (noting that "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion", it may constitute harmless error despite ALJ's failure to follow the § 1527(d)(2) procedural requirements).

---

[4]    Plaintiff also argues that the ALJ improperly ignored Dr. Tyler's April 2002 opinion in which she indicated that Plaintiff had decreased concentration and forgetfulness and walked with a limp, shuffle, and narrowed stance. (Tr. 217-220). However, Dr. Tyler also indicated that she was uncertain at that time whether Plaintiff suffered any *permanent*, functional loss. Furthermore, Dr. Tyler did not indicate that Plaintiff's difficulties resulting in any particular limitations. In any event, to the extent such limitations were encompassed within Dr. Tyler's statements, they are fully incorporated within Dr. Tyler's March 2004 assessment, which is discussed more fully below.

-19-

The ALJ found that Plaintiff had the physical RFC to perform work involving: (1) lifting/carrying 5 pounds occasionally; (2) no pushing or pulling; (3) standing/walking for up to 2 hours in an 8-hour workday; (4) a sit/stand at-will option; (5) rarely stooping, kneeling, or crouching; (6) no forceful gripping, grasping, pinching, twisting, squeezing, or overhead reaching; (7) no crawling; (8) no exposure to vibration or extreme temperatures; and (9) no operation of foot or leg controls. (Tr. 23-24). Such a finding was fully consistent with (and in some instances was even more restrictive than) Dr. Tyler's March 2004 opinion that Plaintiff: (1) could stand/walk for 4 hours in an 8-hour workday; (2) required an at-will sit/stand option; (3) lift/carry 5 pounds occasionally; (4) was extremely limited in her ability to reach, push/pull with her left upper extremity, bend, squat, kneel, and reach above shoulder level; (5) could not push/pull with her right upper extremity; and (6) should avoid all repetitive and forceful use of her upper extremities including the use of vibratory and power tools.

No prejudice, and therefore no error, would have occurred by the ALJ's failure to specifically analyze and discuss Dr. Tyler's March 2004 assessment of Plaintiff's limitations had the above-referenced limitations embodied the entirety of her opinion. However, Dr. Tyler also opined that Plaintiff could physically only sit for 4 hours in an 8-hour workday, required a lie down/recline at-will option, and should only occasionally use her upper extremities to grasp and engage in fine manipulation. Nevertheless, the ALJ determined that Plaintiff could sit for at least 6 hours in an 8-hour workday and frequently use her hands for handling, fingering, and feeling. The ALJ did not discuss the issue that Plaintiff required an at-will lie down/recline option. Moreover, the ALJ found that Plaintiff could perform simple, routine, unskilled work but did not address Dr. Tyler's opinion that Plaintiff was markedly limited (or had no useful ability to function) in her mental ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) complete a normal workday and workweek

-20-

without interruption from psychologically based symptoms and to perform at a consistent basis without an unreasonable number and length of rest periods; (5) respond appropriately to changes in the work setting; and (6) perform one to two step, low-stress, unskilled jobs on a regular basis. (Tr. 305-07).

Defendant offers no justification for the ALJ's failure to either afford controlling weight to Dr. Tyler's opinion regarding all of Plaintiff's physical limitations or to provide a rationale for her decision not to afford it such weight. Defendant does suggest various bases for the ALJ's decision not to adopt Dr. Tyler's assessment of Plaintiff's mental limitations. However, the Court, constrained by *Wilson*, may not make such a determination in the first instance as it is not this Court's function to remedy the ALJ's error by independently searching the record to find substantial evidence to support her ultimate decision. *Wilson*, 378 F.3d at 546; *see also Smith v. Heckler*, 760 F.2d 184, 187 (8th Cir. 1985); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).[5] Therefore, the case must be remanded so that the ALJ may conduct a proper analysis of Dr. Tyler's March 2004 opinion regarding Plaintiff's physical and mental limitations *in its entirety*. To the extent the ALJ rejects any of Dr. Tyler's opinions, the ALJ must specifically cite to the medical findings or other record evidence that support her determination.[6] If such an analysis alters Plaintiff's RFC then the ALJ must also conduct another step five inquiry as would otherwise be appropriate.

### b.   Dr. Krieger's Opinions

Plaintiff also asserts that the ALJ improperly rejected Dr. Krieger's opinion that Plaintiff could

---

[5]    The Sixth Circuit recently analyzed *Wilson* and discussed the application of the harmless error rule to a situation similar to the case at hand. The Sixth Circuit remanded the case for procedural violations of § 1527(d), in part, because the ALJ did not discuss the treating physician's opinion and he implicitly adopted some, but rejected other, opinions of the treating physician without explanation. *Bowen v. Comm'r of Soc. Sec.* 478 F.3d 742, 746-750 (6th Cir. 2007).

[6]    Remand is also appropriate because the VE testified that at least some of the limitations attributed to Plaintiff by Dr. Tyler would prevent Plaintiff from engaging in competitive employment. (Tr. 738-41).

-21-

no longer work, referencing Dr. Krieger's "off-work" note dated October 2001. (Tr. 197). This note stated that Plaintiff was to be "off work" for one day. Although not referenced by Plaintiff, Dr. Krieger wrote similar "off-work" notes for longer (although still temporary) periods of time. (Tr. 270, 283, 294). Plaintiff does not extend any argument to support her position that any of Dr. Krieger's notes amounted to an opinion that Plaintiff was permanently unable to perform any work.[7] To the extent Dr. Krieger's notes can be read to contain such an opinion, Dr. Krieger's opinion was entitled to no "special significance" because this was an issue reserved for the Commissioner. Furthermore, with the exception of the form he completed in August 2002, Dr. Krieger did not specify that Plaintiff's impairments resulted in any particular physical limitations or how those physical limitations affected or prevented certain specific types of work activities.   On the August 2002 form submitted to Plaintiff's former employer, Dr. Krieger noted that Plaintiff could not perform "heavy work, [*sic*] repetitive motion activities." (Tr. 269-70). However, the ALJ incorporated these limitations into his RFC finding by limiting Plaintiff's work involving lifting of no more than 5 pounds occasionally, no forceful gripping, grasping, pinching, twisting, squeezing, or overhead reaching, and no use of vibratory tools.

## VI.   RECOMMENDATION

The Commissioner's decision is not supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 15) should be **DENIED**. Plaintiff's Motion for Summary Judgment (Docket # 8) should be **DENIED**. The case should be **REMANDED** for further proceedings consistent with this Report.

---

[7]     Plaintiff devotes one sentence of her argument to Dr. Krieger's opinion. (Pl.'s Mot. for Summ.J. at 12).

## VII.   <u>NOTICE TO THE PARTIES</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: May 01, 2007     s/ Mona K. Majzoub    
            MONA K. MAJZOUB
            UNITED STATES MAGISTRATE JUDGE

## <u>PROOF OF SERVICE</u>

I hereby certify that copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: May 01, 2007     s/ Lisa C. Bartlett    
            Courtroom Deputy